IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

COMM 2013 CCRE12
CROSSINGS MALL ROAD, LLC,

        Appellant,

v.                  //    CIVIL ACTION NO. 1:18CV11
                           CIVIL ACTION NO. 1:18CV47
                           BANKRUPTCY NO. 1:17BK57
                           (Judge Keeley)

TARA RETAIL GROUP, LLC,

        Appellee.


## MEMORANDUM OPINION AND ORDER AFFIRMING BANKRUPTCY COURT

COMM 2013 CCRE12 Crossings Mall Road, LLC ("COMM 2013"), appeals two orders entered by the United States Bankruptcy Court for the Northern District of West Virginia ("Bankruptcy Court"), overruling COMM 2013's objections to the settlement of certain claims by the debtor, Tara Retail Group, LLC ("Tara Retail"). The primary question presented is whether the debtor may compromise a claim by allowing the claim in its entirety, but agreeing to satisfy the claim, in part, through payment of a smaller sum. For the following reasons, concluding that debtors may do so, the Court **AFFIRMS** the Bankruptcy Court.

## I. BACKGROUND

The parties do not dispute the factual and procedural history relevant to the pending appeals. Tara Retail owns and operates Elkview Crossings Shopping Mall in Elkview, West Virginia

("Crossings Mall"). Among the Crossings Mall's tenants are Dollar
Tree Stores ("Dollar Tree") and The Elswick Company d/b/a Anytime
Fitness ("Elswick"). COMM 2013 is Tara Retail's principal creditor
due to a $13,650,000 commercial loan, which is secured by a lien on
the Crossings Mall, as well as an assignment of its rents.

In June 2016, catastrophic flooding destroyed the bridge and
culvert that provided the only public access to the Crossings Mall,
which remained inaccessible and inoperable for over a year. As a
result, Tara Retail defaulted on its financial obligations. COMM
2013 scheduled a deed of trust sale of the Crossings Mall, but on
January 24, 2017, Tara Retail filed a voluntary petition for
bankruptcy pursuant to Chapter 11 of the Bankruptcy Code.

On May 22, 2017, Dollar Tree filed a proof of claim for
$276,969.28, which consisted of $26,969.28 in overpaid rent from
June 2016 through November 2016; $150,000 in lost profits; $95,000
to reopen for business; and $5,000 in legal fees (D.T. No. 20).[1]

---

[1] As discussed in more detail below, this is a consolidated
appeal regarding the settlement of claims by Dollar Tree and
Elswick. Citations to the designated record on appeal regarding
Dollar Tree are "D.T. No. X," referencing the item numbers assigned
by the Bankruptcy Court (Civil No. 1:18cv11, Dkt. Nos. 3; 6).
Citations to the designated record on appeal regarding Elswick are
"E. No. X," also referencing the item numbers assigned by the
Bankruptcy Court (Civil No. 1:18cv47, Dkt. No. 6). As necessary,
pin cites are provided using the internal pagination of designated
record items. Unless otherwise noted, other citations throughout
this Memorandum Opinion and Order refer to the docket of the lead

<u>**MEMORANDUM OPINION AND ORDER AFFIRMING BANKRUPTCY COURT**</u>

Tara Retail objected, arguing that Dollar Tree's claim should be disallowed in its entirety because Tara Retail did not have a duty or obligation to repair the bridge or provide access to the Crossings Mall given that the culvert was owned and maintained by the State of West Virginia (D.T. No. 1). Thereafter, Tara Retail stipulated to three, month-long extensions of time for Dollar Tree to respond to the objection (D.T. Nos. 22; 23; 24).

Ultimately, on October 31, 2017, Tara Retail and Dollar Tree filed a stipulation to resolve the disputed proof of claim. In relevant part, the stipulation provided:

> Debtor and Dollar Tree agree that: (a) for plan voting purposes only, Dollar Tree shall have an estimated allowed claim for $276,969.28 (the "Voting Claim"), which is comprised of $26,969.28 in post-June 2016 flood rental payments and $250,000 as the estimated expense to repair the condition of the Property to the condition immediately preceding the June 2016 flood; (b) for distribution purposes, the Claim is hereby allowed in the reduced amount of $26,969.28.

(D.T. No. 6 at 3). Dollar Tree agreed to accept $26,969.28 as a credit against rent payments, which would begin to accrue when Dollar Tree reopened for business. <u>Id.</u> at 4. Dollar Tree further "agree[d] to vote in support of the Debtor's plan of reorganization," so long as its terms required Tara Retail to assume the lease agreement entered in 2000. <u>Id.</u> at 1, 5.

_____

case, Civil Action No. 1:18cv47.

## MEMORANDUM OPINION AND ORDER AFFIRMING BANKRUPTCY COURT

COMM 2013 objected to the stipulation between Tara Retail and Dollar Tree (D.T. No. 8). It argued that the stipulation was "nothing more than [a] disguised settlement agreement which should only be approved as part of a proper Rule 9019 motion." Id.[2] As evidence that the stipulation should be reviewed as a settlement, COMM 2013 contended, in part, that the stipulation "appear[ed] to be designed to gerrymander a class of consenting impaired claims." In other words, rather than simply assume the lease in exchange for Dollar Tree's concessions, Tara Retail had structured the stipulation to require Dollar Tree to vote for its plan. Id.

During a hearing on November 14, 2017, the Bankruptcy Court acknowledged that Rule 9019 may have provided a better framework for addressing the stipulation. After reviewing the relevant factors, however, the Bankruptcy Court concluded that the parties had adequate notice and that the stipulation represented a sound business judgment by Tara Retail (D.T. No. 9 at 28-34). It thus

---

[2] Pursuant to Fed. R. Bankr. P. 9019, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." "A court reviews a Rule 9019 motion to compromise against 'the outcome of four factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.'" In re Fairmont Gen. Hosp., Inc., 510 B.R. 783, 790 (Bankr. N.D.W.Va. 2014) (quoting In re Buffalo Coal Co., No. 06-366, 2006 WL 3359585 (Bankr. N.D.W.Va. Nov. 15, 2006)).

found the stipulation acceptable with the exception of the voting rights issue raised by COMM 2013 in its objection. Therefore, the Bankruptcy Court ordered additional briefing on whether allowing Dollar Tree to vote the full amount of its claim would violate the Bankruptcy Code or voting process (D.T. No. 10).

In its supplemental brief, COMM 2013 argued that a creditor's voting rights must be identical to its payment rights, and that the stipulation improperly locked up votes in violation of 11 U.S.C. § 1125(b) (D.T. No. 11).[3] During a further hearing had on December 19, 2017, in a thoroughly reasoned oral ruling, the Bankruptcy Court overruled COMM 2013's objection and approved the stipulation between Tara Retail and Dollar Tree (D.T. No. 13). When COMM 2013 noted its appeal from the ruling (D.T. No. 14), the Bankruptcy Court entered a "memorandum opinion restating its justification for approving the Debtor's resolution of its objection to Dollar Tree's proof of claim" (D.T. No. 19 at 1).

First, the Bankruptcy Court disagreed with COMM 2013's contention that voting rights must be identical to payment rights. The court "viewed the stipulation as allowing Dollar Tree's claim in the full amount despite Dollar Tree's agreement to accept . . .

_____

[3] Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case" and before approval of a written disclosure statement.

merely a percentage payment on its allowed claim." _Id._ at 5. Indeed, "unsecured creditors often receive a fraction of their claims in bankruptcy." _Id._ In addition, the Bankruptcy Court thought it significant that Dollar Tree was "not receiving any benefit that it would not otherwise possess in the absence of an objection," and that the stipulation did not result in prejudice to similarly situated unsecured creditors. _Id._ at 4-5.

Second, the Bankruptcy Court disagreed that the stipulation constituted an impermissible solicitation under § 1125(b). _Id._ at 5. In its view, "solicitation" should be construed narrowly to avoid "inhibit[ing] free creditor negotiations" such as those between Tara Retail and Dollar Tree. Moreover, Dollar Tree's vote is not "locked up" by virtue of the stipulation because it is contingent on Tara Retail proposing a plan that includes its assumption of the pre-existing lease agreement. _Id._ at 5-6.

Also at issue in this appeal is an unspecified proof of claim filed by Elswick on May 22, 2017 (E. No. 19). The basis of its claim was "[d]amages as tenants of the shopping center, including but not limited to interruption of business, loss of revenue, loss of business value, loss of good will, and other damages, as a result of the culvert failure" _Id._ at 2. Tara Retail objected to Elswick's claim on the same grounds upon which it objected to

Dollar Tree's claim (E. No. 22). After full briefing on the objection (E. Nos. 30; 32), on December 18, 2017, Tara Retail and Elswick moved the Bankruptcy Court to approve a compromise of Elswick's claim (E. No. 1).

The motion to compromise included provisions similar to those at issue with Dollar Tree:

   a.   For plan voting purposes, Elswick shall have an estimated allowed claim for $835,888.00 (the "Voting Claim"), which is comprised of Elswick's historical and future damages, as set forth in the demand letter and expert report provided by Elswick's counsel.

   b.   Under Tara's plan of reorganization, and provided such plan of reorganization is confirmed, Elswick will receive in full satisfaction of its Allowed Claim (i) $21,431.65, representing one month of rent paid for the month of July, 2016, and four (4) month's rent for period accruing after August 1, 2017; and (ii) assignment of Tara's claim under its Commercial Insurance policy issued by Travelers Indemnity Company for the period 9/11/2015 to 9/11/2016, to the extent of the claim for business interruption, loss of revenue, loss of goodwill, and any other claims asserted by Elswick against Tara.

Id. at 3. As with Dollar Tree, Elswick would recover the $21,431.65 through "a contingent right of recoupment against rent due" under its lease agreement with Tara Retail. Id. at 4. In addition, Elswick "agree[d] to vote in support of the Debtor's plan of reorganization so long as it incorporate[d]" Tara Retail's assumption of Elswick's 2013 lease agreement. Id. at 5.

## MEMORANDUM OPINION AND ORDER AFFIRMING BANKRUPTCY COURT

COMM 2013 objected to the compromise, again arguing that voting rights must be identical to payment rights, and that the agreement impermissibly locked up votes under § 1125(b) (E. No. 5). In addition, COMM 2013 argued that "a right of recoupment for post-petition rents" constituted an impermissible use of its cash collateral. Id. at 4-5. Following a hearing on February 13, 2018 (E. No. 11), the Bankruptcy Court overruled COMM 2013's objection. It incorporated its reasoning with regard to the Dollar Tree stipulation and further disagreed that Tara Retail was improperly using COMM 2013's cash collateral. Rather, it viewed Elswick's right of recoupment as superior to both Tara Retail and COMM 2013's interest in post-petition rents (E. Nos. 17; 33).

On February 26, 2018, COMM 2013 timely noted its appeal from this ruling (E. No. 12), placing both the Dollar Tree and Elswick compromises before this Court. At the parties' request, on March 9, 2018, the Court consolidated COMM 2013's appeals regarding the Dollar Tree stipulation and the Elswick compromise (Dkt. No. 3). The consolidated appeal is now fully briefed.

## II. JURISDICTION

District courts have jurisdiction to hear appeals "from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under

<u>**MEMORANDUM OPINION AND ORDER AFFIRMING BANKRUPTCY COURT**</u>

section 157." 28 U.S.C. § 158(a). Such proceedings include "core proceedings," which encompass "allowance or disallowance of claims against the estate." <u>Id.</u> § 157(b)(2)(B); <u>see also</u> <u>In re Johnson</u>, 960 F.2d 396, 401 (4th Cir. 1992).

### III. STANDARD OF REVIEW

A district court sitting in its capacity as a bankruptcy appellate court reviews "findings of fact only for clear error, but consider[s] the relevant legal questions <u>de novo</u>." <u>In re Varat Enters., Inc.</u>, 81 F.3d 1310, 1314 (4th Cir. 1996). Therefore, when the parties do not dispute the relevant facts, the Court's review is <u>de novo</u>. <u>See</u> <u>In re Jones</u>, 591 F.3d 308, 310 (4th Cir. 2010).

### IV. DISCUSSION

**A.   COMM 2013 is a party in interest with standing to object to the compromises and maintain this appeal.**

The parties first dispute whether COMM 2013 had standing to challenge the compromises in the Bankruptcy Court, as well as whether it has standing to bring the instant appeals (Dkt. Nos. 4 at 19-20; 11 at 28-21). "A party in interest, including the debtor, the trustee, . . . a creditor, [and] an equity security holder . . . may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b); <u>see also</u> <u>id.</u> § 502(a) ("A claim or interest . . . is deemed allowed, unless a party in

interest . . . objects."). "Although the Code does not define the term 'party in interest,' the term 'is generally understood to include all persons whose pecuniary interests are directly affected by the bankruptcy proceedings.'" In re Hutchinson, 5 F.3d 750, 756 (4th Cir. 1993) (quoting White Cty. Bank v. Leavell, 141 B.R. 393, 399 (Bankr. S.D. Ill. 1992)); see also In re Alpha Nat. Res. Inc., 544 B.R. 848, 854-55 (Bankr. E.D. Va. 2016) (collecting cases).

Tara Retail argues that "COMM 2013 does not have and has not even alleged that it has an interest that would be diminished as a result of the" compromises (Dkt. No. 11 at 18).[4] This contention is spurious, at best, in light of COMM 2013's interest in both the bankruptcy proceeding as a whole and the compromises at issue here. As Tara Retail's principal secured creditor, COMM 2013 plainly holds a pecuniary interest that is directly affected by the bankruptcy proceeding. See In re Hutchinson, 5 F.3d at 756. Indeed, it is difficult to imagine a party with a greater interest in the bankruptcy proceeding than the creditor from whom Tara Retail borrowed $13,650,000.

---

[4] The Bankruptcy Court did not actually hold that COMM 2013 lacked standing to object to the compromises, and indeed it thoroughly addressed COMM 2013's objections. The court mentioned only in dicta that, if "COMM 2013 is fully secured or even oversecured," it is "unlikely that COMM 2013 could establish sufficient standing to object to the Debtor's resolution of unsecured proofs of claim" (D.T. No. 19 at 5).

Moreover, the compromises themselves directly affect COMM 2013's pecuniary interest. That COMM 2013 is a secured creditor does not necessarily mean that it cannot be affected by an agreement between Tara Retail and an unsecured creditor. For example, as the parties and the Bankruptcy Court recognized below, the disposition of rent credits under the compromises impacts the amount of COMM 2013's security interest in Tara Retail's collection of rent (E. No. 17); <u>see also</u> <u>In re Panache Cuisine, LLC</u>, No. 13-17027-JS, 2013 WL 5350613, *3 (Bankr. D. Md. Sept. 23, 2013) (recognizing standing of "a creditor of the bankruptcy estate holding a pecuniary interest that will be diminished if the Trustee obtains authorization to pay [a] claim").

In addition, the compromises involve contingent agreements to vote in support of Tara Retail's plan of reorganization. Notably, Tara Retail's first amended plan included such things as the cancellation and discharge of loan documents related to COMM 2013 and the execution of new documents (Dkt. No. 8-1 at 51). According to COMM 2013, the new loan documents include a significant balloon payment and a new interest rate that it opposes (Dkt. No. 12 at 8). To the extent that Tara Retail intends to advocate in favor of a plan that would adversely affect COMM 2013, an agreement to vote in favor of the plan plainly affects the lender's pecuniary interest.

In sum, the Court readily concludes that COMM 2013 holds a pecuniary interest affected by both the bankruptcy proceeding and the compromises at issue in these appeals. It thus finds that COMM 2013 has standing to object to the agreements between Tara Retail and the unsecured creditors.

**B.  The Bankruptcy Court did not err by allowing the claims in full but permitting Tara Retail to settle in a lower amount.**

COMM 2013 primarily takes issue with one salient feature of the parties' agreements. In both the Dollar Tree stipulation and the Elswick compromise, Tara Retail allowed the claim in full "for plan voting purposes," but agreed to satisfy the claim in a lower or different amount (D.T. No. 6 at 3; E. No. 1 at 3). COMM 2013 contends that such arrangements should not be countenanced by the Court because they 1) divorce voting rights from payment rights under the Bankruptcy Code, 2) permit fully paid claims to be voted during plan confirmation, and 3) allow the debtor to manipulate plan voting to the prejudice of other creditors (Dkt. No. 4 at 12-21). Each of these contentions is unavailing.

*First*, COMM 2013 contends that a creditor's voting rights cannot be different than its payment rights. Id. at 12. The Bankruptcy Code defines a "claim" as a "right to payment" or a "right to an equitable remedy for breach of performance if such

breach gives rise to a right of payment." 11 U.S.C. § 101(5). Whether the Bankruptcy Court "allow[s]" a claim against the bankruptcy estate depends on the resolution of objections to the validity of the claim. Id. § 502. The existence of a valid claim and the amount of the claim that ultimately is allowed are important. "The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." Id. at § 1126(a). Voting power for plan confirmation is calculated by reference to the amount of each allowed claim. Id. § 1126(c).

Contrary to COMM 2013's contention, the Bankruptcy Court did not allow the claims in different amounts for voting purposes than for payment purposes. As the Bankruptcy Court explained on the record, it allowed the Dollar Tree claim in only one amount: "the estimated amount of $276,000" (D.T. No. 13 at 39). The claim was not "allowed . . . for distribution purposes" in a different, lower amount. Rather, from the Bankruptcy Court's perspective, Dollar Tree agreed to accept $26,000 in satisfaction of the fully allowed claim. Id.

*Second*, COMM 2013 contends that, because rent credits will be applied in advance of plan confirmation, the claims will be paid-in-full and non-voteable (Dkt. No. 4 at 13-14). COMM 2013 is correct that one's voting power is based on his "right to payment"

or "right to an equitable remedy." See 11 U.S.C. § 1126(a). But both Dollar Tree and Elswick will still have fully allowed claims against Tara Retail when it comes time to confirm a plan of reorganization. The Elswick compromise clearly indicates that satisfaction of the allowed claim will not take place until Tara Retail obtains approval of a corresponding plan of reorganization (E. No. 1 at 3). The Dollar Tree stipulation is contingent, in part, on Dollar Tree's vote for a plan that includes Tara Retail's assumption of the parties' lease agreement (D.T. No. 6 at 5). In other words, the proposed plan and creditors' votes are part of settling the allowed claims, which will still constitute rights to payment at the time that creditors vote on Tara Retail's plan.[5]

*Third*, COMM 2013 contends that "[t]he Bankruptcy Court's reasoning in both the Oral Ruling and Memorandum Option [sic] contains several errors of law which contributed to its decision to approve the Stipulations" (Dkt. No. 4 at 14). COMM 2013 argues that the Bankruptcy Court erroneously assumed that Tara Retail 1) could have declined to object to the claims, 2) concluded that creditors were not prejudiced by the stipulations, and 3) concluded that

---

[5] At the time of voting, it will be incumbent upon the Bankruptcy Court to determine the extent to which, if at all, the creditors' "right to payment," and thus voting power, has been reduced by credits against rent.

there was no evidence of an intent to manipulate plan voting. Id. at 14-18.

Pursuant to Rule 9019, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." "A court reviews a Rule 9019 motion to compromise against 'the outcome of four factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.'" In re Fairmont Gen. Hosp., Inc., 510 B.R. at 790 (quoting In re Buffalo Coal Co., No. 06-366, 2006 WL 3359585).

The Bankruptcy Court conducted a Rule 9019 analysis for both the Dollar Tree and Elswick compromises, considering "whether the debtor [was] exercising sound business judgment in comprising a particular claim" (D.t. No. 9 at 32).[6] First, it reasoned that Dollar Tree was almost certain to succeed on its claim for post-flood rent, and that there were risks associated with litigating

---

[6] One of COMM 2013's primary objections below was that Tara Retail did not seek approval for the Dollar Tree stipulation under Rule 9019 (D.T. No. 8). At the hearing on the stipulation, however, the Bankruptcy Court concluded that the creditors had received sufficient notice and considered the stipulation under Rule 9019 (D.T. No. 9 at 31). COMM 2013 does not challenge this ruling.

the claim for business interruption damages. Id. at 32-33. The court reasoned that the second factor, difficulty of collection, did not apply because the debtor was not attempting to recover. Id. at 33. As for the third factor, complexity of the litigation, the Bankruptcy Court acknowledged that the compromise would prevent the debtor from engaging in expensive and complex litigation regarding the business interruption claim. Id. at 33-34. Finally, the court concluded that the creditors would substantially benefit from Dollar Tree's willingness not to pursue monetary compensation for its business interruption claim. Id. at 34. COMM 2013 has not challenged this analysis on appeal, and its brief does not cite Rule 9019.

Rather, before the Bankruptcy Court and now on appeal, COMM 2013 has argued that the compromises should not be approved because the claim is allowed in a different amount than the creditors agreed to accept in satisfaction. In essence, COMM 2013 contends that the compromises should be presumed impermissible because there is no valid reason to agree that a claim be allowed in its entirety but satisfied by a lower figure. In support, it relies primarily on the contents of a footnote from an unpublished opinion:

> The parties originally agreed to compromise these claims at (1) for purposes of voting on a plan of reorganization, a total of $70 million for the Class Claims and $121 million for Morning Star, and (2) for

16

> purposes of distribution, a total of $10.5 million for
> the Class Claims and $18.15 million for Morning Star. In
> other words, the claims would be allowed at one amount
> for purposes of voting and a much lower amount for
> purposes of distribution—an amount equal to 15% of the
> voting amount.
>
> At the initial hearing, the court expressed its concern
> that allowing the claims at one amount for distribution
> purposes but at an amount more than six times higher for
> voting purposes appeared designed to manipulate the
> voting process; that is, it appeared to give these
> claimants voting power disproportionate to their true
> economic interests in the case and unfairly greater than
> the voting power of the other general unsecured
> creditors.

In re SK Foods, L.P., No. 09-20162-D-11, 2011 WL 10715382, at *1

(E.D. Cal. Jan. 27, 2011).

Indeed, the Bankruptcy Court expressed a similar concern

during the Dollar Tree hearing (D.T. No. 9 at 56), but ultimately

rejected COMM 2013's argument as an independent basis to reject

Tara Retail's proposed settlements (D.T. No. 19). In doing so, it

reasoned that settlement of the claims correlates with the

creditors' voting power and possible recovery in the absence of any

objection. Id. at 4-5. Tara Retail has an obligation to object to

the allowance of improper claims, 11 U.S.C. §§ 1106(a), 1107(a),

but COMM 2013 has not argued that the full amount of the claims was

invalid, that they were arrived at through fraud or collusion, or

that Tara Retail improperly spurned its duty to object to invalid

claims. Because no party opposed the settlement on these grounds,

the Bankruptcy Court had little reason to reject allowance of the full claims; other creditors are not impermissibly prejudiced simply because another valid claim is allowed in full.

Although COMM 2013 argues that allowing a claim in a different amount than it is satisfied constitutes <u>de facto</u> vote manipulation (Dkt. No. 4 at 18), there certainly are non-manipulative reasons a debtor and creditor might enter such an agreement. A creditor may decide that ensuring the presence of a particular provision in the debtor's proposed plan of reorganization is more important to it than receiving full monetary compensation, especially when the bankruptcy estate will not likely be sufficient to satisfy the full claim. For instance, both Dollar Tree and Elswick bargained for plan provisions that include the assumption of their existing lease agreements (D.T. No. 6 at 1, 5; E. No. 1 at 5).

In conclusion, COMM 2013 attacks the reasonableness of allowing two unsecured claims in full, but it does so without presenting any concrete argument or evidence that the claims are improper.[7] COMM 2013's abstract concern with the disparity between the allowed claims and the monetary amounts accepted as partial

---

[7] COMM 2013 points only to the fact that Tara Retail objected to the claims and that the creditors accepted payment in reduced amounts as evidence that the claims were overstated (Dkt. No. 4 at 15). But these facts are true of any settled claim.

settlement is insufficient to outweigh the Bankruptcy Court's careful analysis of the Rule 9019 factors. Therefore, the Court **AFFIRMS** the Bankruptcy Court's decision to approve the compromises between Tara Retail and its unsecured creditors, Dollar Tree and Elswick.

### C.    The compromises do not constitute impermissible agreements in violation of § 1125(b).

COMM 2013 also contends that the stipulations are impermissible "lock up" agreements in violation of 11 U.S.C. § 1125(b) (Dkt. No. 4 at 21-22). Under that section,

> [a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

According to COMM 2013, the compromises directly violate the plain language of the statute because they amount to an impermissible "solicitation" of "votes in favor of a plan prior to approval of a disclosure statement" (Dkt. No. 12 at 12).

As other courts have recognized, however, there is an appreciable difference between permissible "post-petition plan support agreements" and lock-up agreements that violate the prohibition on solicitation under § 1125(b). See In re Residential

Capital, LLC, No. 12-12020, 2013 WL 3286198, at *19-20 (Bankr. S.D.N.Y. June 27, 2013). In other words, the term "solicitation," which is not defined in the Bankruptcy Code, "should relate to the formal polling process in which the ballot and disclosure statement are actually presented to creditors with respect to a specific plan, and the term should not be read so broadly as to chill the debtor's postpetition negotiations with its creditors." Id. (quoting 7 Collier on Bankruptcy ¶ 1125[1])). This is consistent with the very purpose of § 1125, which "was designed to 'discourage the undesireable practice of soliciting acceptance or rejection at a time when creditors and stockholders were too ill-informed to act capably in their own interests.'" In re Heritage Org., LLC, 376 B.R. 783, 294 (Bankr. N.D. Tex. 2007) (quoting In re Clamp-All Corp., 233 B.R. 198, 208 (Bankr. D. Mass. 1999)).

As did the Bankruptcy Court, the Court finds persuasive the reasoning in In re Heritage Org., LLC, where the Bankruptcy Court for the Northern District of Texas acknowledged that

> "[t]he majority of courts to have considered the contours of [solicitation] have defined it narrowly." Zenter GBV Fund IV v. Vesper, 19 F. App'x 238, 247 (6th Cir. 2001) (unpublished disposition) (the terms "solicit" and "solicitation" must "be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan ... [t]he terms do not encompass discussions, exchanges of information, negotiations, or tentative arrangements...."); Century Glove, Inc. v. First American Bank of New York, 860 F.2d

94, 101–02 (3d Cir. 1988) (the term "solicitation" must be read narrowly. A broad reading of § 1125 can seriously inhibit free creditor negotiations ... we find no principled, predictable difference between negotiation and solicitation of future acceptances. "We therefore reject any definition of solicitation which might cause creditors to limit their negotiations"); In re Kellogg Square P'ship, 160 B.R. 336 (Bankr. D. Minn. 1993). As the Third Circuit noted in Century Glove,

"A narrow definition might allow a debtor to send materials seeking to prepare support for the plan, 'for the consideration of the creditors,' without adequate information approved by the court. Though such preparatory materials may undermine the purpose of adequate disclosure, the potential harm is limited in several ways. First, a creditor still must receive adequate information before casting a final vote, giving the creditor a chance to reconsider its preliminary decision. The harm is further limited by free and open negotiations between creditors."

Id. at 791–92. Consistent with this authority, the court concluded that a plan support agreement is not an impermissible "solicitation" if "it [is] clear that arm's length negotiations, in fact, had occurred, even where the creditor agreed to support the debtor's plan . . . as consideration for the agreed treatment of the creditor's claim under the debtor's to-be-filed plan." Id. at 792–93 (quoting Robert J. Keach, A Hole in the Glove: Why "Negotiation" Should Trump "Solicitation", 22-JUN Am. Bankr. Inst. J. 22 (June 2003)).[8]

---

[8] The two contrary decisions relied upon by COMM 2013 are In re NII Holdings, Inc., 288 B.R. 856 (Bankr. D. Del. 2002), and In re Stations Holding Co., Inc., 2002 WL 31947022 (Bankr. D. Del.

Here, the compromises do not run afoul of the majority, narrow interpretation of "solicitation" under § 1125(b). As an initial matter, the agreements were the product of arms-length negotiations regarding the claims of two unsecured creditors. Tara Retail objected to the proofs of claim filed by Dollar Tree and Elswick, but the parties continued to cooperate and repeatedly stipulated to extensions of time for the creditors to respond (D.T. Nos. 22; 23; 24; E. Nos. 28; 31). Briefing only occurred with regard to Tara Retail's objection to Elswick's proof of claim, and the Bankruptcy Court did not rule on either objection (E. Nos. 30; 3). Instead, following a months-long "effort negotiating with Dollar Tree and Elswick," Tara Retail reached an agreement with both creditors to avoid further litigation (Dkt. No. 11 at 21-22).

Importantly, the parties reached their compromises after Tara Retail filed its first proposed plan and disclosure statement, and both Dollar Tree and Elswick were represented by counsel throughout the negotiation process. Taken together, the circumstances indicate

---

2002), in which the court refused to honor plan support agreements. "These cases generally have been distinguished on the grounds that the agreements at issue included specific performance provisions, expressly providing that monetary damages could not compensate a breach of the agreement, meaning the creditors could not later reconsider their preliminary decision after receiving adequate information." In re Residential Capital, LLC, No. 12-12020, 2013 WL 3286198, at *20 (internal quotation omitted). The agreements among Tara Retail, Dollar Tree, and Elswick contain no such provision.

that the compromises resulted from informed negotiations between parties capable of acting in their own interest. Such actions simply fall outside the scope of ill-informed solicitations that Congress meant to avoid with § 1125(b). See In re Heritage Org., LLC, 376 B.R. at 792-93; In re Residential Capital, LLC, No. 12-12020, 2013 WL 3286198, at *19-20.

Finally, the parties' agreements in this case do not truly "lock up" any votes in favor of Tara Retail's plan. Both the Dollar Tree and Elswick compromises are contingent upon Tara Retail seeking approval of a plan that conforms to certain terms (D.T. No. 6 at 5; E. No. 1 at 3-5). In that regard, this case is akin to In re Kellogg Square P'ship, where the court reasoned:

> [The creditor's] agreement to accept the Debtor's plan, made post-petition but before approval of the disclosure statement, remained executory until [the creditor] actually filed its accepting ballot with the clerk of this Court. Neither the recitation in the disclosure statement, nor the parties' execution of the written memorandum, constituted an acceptance of the plan as such. The agreement did not purport to exempt the Debtor from its statutory obligation to present [the creditor] with a court-approved disclosure statement.
>
> The resultant status of the agreement, then, is crucial: had the final, court-approved disclosure statement revealed information that materially bore on [the creditor's] interests, and had the Debtor previously failed to disclose that information to [the creditor], [the creditor] would have had a right under general, nonbankruptcy law to repudiate the agreement via rescission, and then to cast a rejecting ballot.

160 B.R. 336, 339-40 (Bankr. D. Minn. 1993).

For these reasons, the Court concludes that Tara Retail did not engage in impermissible "solicitation" under § 1125(b). Rather, the compromises at issue are the result of well-informed, arms-length negotiations between Tara Retail and its creditors.

## V. CONCLUSION

For the reasons discussed, the Court **AFFIRMS** the Bankruptcy Court's orders overruling COMM 2013's objections and approving Tara Retail's settlement of the claims at issue.

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Memorandum Opinion and Order to counsel of record, to enter a separate judgment order, and to strike the consolidated cases from the Court's active docket.

DATED: August 30, 2018.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE